UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | Hon. John Michael Vazquez |
| v. | : | |
| | : | Criminal No. 20-578 |
| JEFFREY ANDREWS, | : | |
| CHAD BEENE, and | : | |
| ADAM BROSIUS | : | |
| | : | |

---

## GOVERNMENT'S OMNIBUS MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' PRETRIAL MOTIONS

---

PHILIP R. SELLINGER
UNITED STATES ATTORNEY
970 Broad Street
Newark, New Jersey 07102
(973) 645-2700

On the Brief:

JASON S. GOULD
JOSHUA L. HABER
Assistant U.S. Attorneys

## TABLE OF CONTENTS

**Page**

INTRODUCTION ..................................................................................................... 2

BACKGROUND ...................................................................................................... 3

ARGUMENT ........................................................................................................... 8

I.    Brosius's motion to dismiss Counts 1 and 8 of the Indictment should be denied because neither is duplicitous. .......................................................... 8

      A.    Count 1 of the Indictment alleges a single conspiracy. ........................ 12

      B.    Count 8 of the Indictment also alleges a single conspiracy. ................. 14

II.    The defendants' motions for a Bill of Particulars should be denied because the Indictment and discovery provide ample information about the charged crimes, but the Government will supplement that information by letter to identify certain entities and individuals. .......................................................... 16

III.    Brosius's motion to strike surplusage should be denied. ................................ 22

IV.    Defendants' requests for early disclosure of the Government's 404(b) evidence should be denied. ............................................................................................ 25

V.    Beene's motion for the immediate production of *Brady* and *Giglio* material should be denied. ............................................................................................ 26

VI.    Beene's motion for early disclosure of Jencks material should be denied. ...... 27

VII.    Beene's request for a *Kastigar* hearing is misplaced and should be denied. ... 29

VIII.    Beene's motion for a hearing on the admissibility of co-conspirator and unindicted co-conspirator statements should be denied. ................................ 31

IX.    Beene's motion for a cautionary instruction regarding cooperating witnesses related to Main Avenue Pharmacy should be denied. ..................................... 33

CONCLUSION ........................................................................................................ 34

# INTRODUCTION

Defendants Jeffrey Andrews, Chad Beene, and Adam Brosius were charged in a fifteen-count Indictment by a Grand Jury sitting in Newark, New Jersey on or about July 10, 2020 of the following health-care-related crimes:

- **Count 1**: conspiracy to commit health care fraud, contrary to 18 U.S.C. § 1347, in violation of 18 U.S.C. § 1349 (Andrews, Beene, and Brosius);

- **Counts 2-3**: substantive health care fraud offenses, in violation of 18 U.S.C. §§ 1347 and 2 (Beene);

- **Counts 4-7**: substantive health care fraud offenses, in violation of 18 U.S.C. §§ 1347 and 2 (Andrews, Beene, and Brosius);

- **Count 8**: conspiracy to violate the Anti-Kickback Statute, contrary to 42 U.S.C. § 1320a-7b(b)(2)(B), in violation of 18 U.S.C. § 371 (Andrews, Beene, and Brosius);

- **Counts 9-10**: substantive violations of the Anti-Kickback Statute, in violation of 42 U.S.C. § 1320a-7b(b)(2)(B) and 18 U.S.C. § 2 (Beene); and

- **Counts 11-15**: substantive violations of the Anti-Kickback Statute, in violation of 42 U.S.C. § 1320a-7b(b)(2)(B) and 18 U.S.C. § 2 (Andrews, Beene, and Brosius).

Trial on these charges has not been scheduled.

The indictment also charged defendant Robert Schneiderman with Counts 1-3 and 8-10, but Schneiderman pleaded guilty to Counts 1 and 8 of the Indictment on or about March 29, 2022. ECF No. 76. Schneiderman is awaiting sentencing.

The Government respectfully submits this memorandum of law in opposition to Andrews's, Beene's, and Brosius's pretrial motions, filed on December 15, 2021. *See* ECF No. 60 (Andrews's Motion for a Bill of Particulars ("Andrews Mot.")); ECF No. 62 (Brosius's Omnibus Pretrial Motions ("Brosius Br.")); and ECF Nos. 63-70 (Beene's

Pretrial Motions on various subjects).  Defendants seek a variety of relief.  Primarily, Brosius asks for Counts 1 and 8 of the Indictment to be dismissed because, he argues, they allege duplicitous conspiracies.  Meanwhile, all defendants request a bill of particulars on a host of information that they insist they need to prepare an adequate defense.  And defendants make a variety of discovery-related motions.

Defendants' motions should all be denied.  The Court should not dismiss Counts 1 or 8 of the Indictment based on duplicity or charging multiple conspiracies in a single conspiracy count.  It is well-settled that a conspiracy charge—even to commit several crimes—is not duplicitous.  Furthermore, whether a particular count charges a single conspiracy or multiple conspiracies is a question of fact for the jury and is not the appropriate subject for a pretrial motion to dismiss.

Furthermore, the defendants' motions for a bill of particulars should also be denied.  The detailed Indictment and extensive discovery provide sufficient information for the defendants to mount their defense at trial.  As a courtesy, the Government will provide certain identifying information in a discovery letter, but the bulk of defendants' requests on this score should be denied as overbroad, irrelevant, and unnecessary.

The remainder of defendants' pretrial motions concern discovery and are meritless for the reasons discussed below.  They should be denied as well.

## BACKGROUND

At trial, the Government anticipates that it will introduce evidence demonstrating the following facts, which are alleged in the Indictment:[1]

Main Avenue Pharmacy was a mail-order compounding pharmacy located in Clifton, New Jersey.  It was purchased by a publicly traded company called ScripsAmerica, Inc. ("Scrips") in 2013 and was a wholly owned subsidiary of Scrips.

Main Avenue Pharmacy did not have its own board of directors but was run primarily by the following executives of Scrips:

- Defendant Schneiderman was the founding partner, CEO, and President of Scrips;

- Defendant Andrews was the CFO of both companies; and

- Defendant Beene was the national sales manager for both companies.

Schneiderman was forced out of both companies around June 30, 2015.

Defendant Brosius, meanwhile, was the director of business development for Scrips until June 30, 2015—the date Schneiderman was fired—when he was named interim President.  Brosius was named President of Scrips in November 2015 and was also the President of Main Avenue.  Brosius owned several marketing companies, including one called Pharma Sales Group.

In or about 2014, the defendants learned that both public and private health insurance payors (i.e. Medicare and Tricare[2] (public) and commercial insurance

---

[1] Only those facts relevant to resolving defendants' pretrial motions are included, and the Government may offer evidence of additional facts at trial.

[2] Tricare is the health insurance payor for the Department of Defense.

companies (private)) would pay far more money via reimbursements to supply patients with compounded medications than their non-compounded equivalents. Compounding is a practice in which a pharmacist or physician combines, mixes, or alters ingredients of a drug to create a medication tailored to the needs of an individual patient. The Food and Drug Administration (FDA) does not approve compounded drugs and thus does not verify the safety, potency, effectiveness, or manufacturing quality of compounded drugs. Generally, a physician may prescribe compounded drugs when an FDA-approved drug does not meet the health needs of a particular patient. Examples of compounded medications include vitamins, pain creams, scar creams, and migraine medication.

In 2014, to take advantage of these lucrative reimbursements for compound medications, Andrews, Brosius, and Schneiderman caused Main Avenue Pharmacy to enter into an agreement with Pharma Sales, which was controlled by Brosius. Pursuant to that deal, Main Avenue Pharmacy agreed to pay commissions to Pharma Sales based on the total money in reimbursements that Main Avenue Pharmacy received from health insurance payors for compounded medications. Pharma Sales, in turn, then contracted with various marketing companies around the country. The marketing companies aimed to generate as many prescriptions as possible—from doctors from around the country for patients in other parts of the country—for compounded medications, which they then directed to Main Avenue Pharmacy in New Jersey for fulfillment. The agreements called for Pharma Sales to pay commissions to the marketing companies based on the volume of prescriptions that they sent to Main

4

Avenue Pharmacy and that resulted in reimbursements. The more prescriptions that the marketing companies sent to Main Avenue Pharmacy, the more money they stood to earn. Consequently, the marketing companies targeted beneficiaries of Tricare, Medicare, and commercial insurance companies—which reliably paid for compounds at the time—to maximize the potential profits from the scheme, regardless of whether those beneficiaries were bona fide patients of the doctors writing the prescriptions.

Brosius, Beane, and Andrews—who had no medical training or licenses and who were not pharmacists—then began creating Main Avenue Pharmacy prescription pads to maximize reimbursements. To uncover lucrative ingredient formulas, Beene and Brosius directed employees of Main Avenue Pharmacy to submit false claims to insurers through a practice known as "test billing." They often received proposed formulas from marketing companies who had learned of profitable formulas through their work in the scheme with other pharmacies. The purpose of "test billing" was to confirm how much an insurance payor would reimburse for a particular formula. Main Avenue Pharmacy subsequently included the most profitable formulas on its prescription pads so a physician could choose from a limited number of specific, very expensive ingredient mixes for the compounded medications—typically some combination of pain cream, scar cream, migraine medication, and vitamins. These prescription pads therefore contained compounded medication formulas that were constructed based on reimbursement amounts and not the medical or health needs of any particular patient.

5

Beene and Brosius designed Main Avenue Pharmacy's prescription pads to be easy to use so physicians would reliably prescribe the compounds that yielded expensive reimbursements.  For example, the pads contained check boxes next to each compounded medication to increase the likelihood that the physician would not change the formula, which could lower the reimbursement amount.  The prescription pads also allowed the doctor to select, in some cases, over 10 refills without an additional prescription.  Finally, the pads typically had a check box that allowed the physician to authorize Main Avenue Pharmacy to substitute or change the prescribed medication to an alternate compound formula covered by the beneficiary's insurance.  If the physician checked this box, Main Avenue Pharmacy could alter the formula prescribed by the physician to ensure that the beneficiary's insurance would cover the prescription at a high rate, regardless of whether the altered formula was consistent with the patient's medical needs.

After a prescription pad was finalized, Beene and Brosius disseminated it to the marketing companies they had deals with, either through Main Avenue Pharmacy or Pharma Sales.  The marketing companies, in turn, identified and referred beneficiaries and the prescription pads to various telemedicine companies and doctors with whom the marketing companies had financial agreements.  The physicians regularly filled out and signed the prescriptions without having examined, seen, or even spoken to the patient.  Typically, because they were paid by the marketing companies to authorize prescriptions, neither the telemedicine companies nor the doctors billed the patients' insurance for their services.

6

Once a physician signed a prescription for a beneficiary, typically using Main Avenue Pharmacy's prescription pad and often including prescriptions for multiple medications, the prescription was transmitted to Main Avenue Pharmacy through unique e-fax numbers, which Brosius created for each marketing company. This allowed Main Avenue Pharmacy to receive prescriptions quickly, track the prescriptions for each marketing company, and calculate commissions owed to Pharma Sales and the downstream marketing companies based on the volume of referrals and reimbursement amounts.

Brosius also instructed employees of Main Avenue Pharmacy to confirm that beneficiaries who had already received a compounded medication from Main Avenue Pharmacy would receive refills of the same compounded medication. Brosius did this to ensure that the defendants could continue to reap illicit profits without having to collect an additional prescription from a physician.

Patients complained to Main Avenue Pharmacy that they did not request or want the compounded prescription medications that they received. The patients also repeatedly told Main Avenue Pharmacy employees that they never saw, spoke to, or heard of the doctor who prescribed them compounded medication. Andrews, Brosius, and Schneiderman were advised of these complaints but ignored them. To protect their profits, Andrews and Brosius ordered Main Avenue Pharmacy employees to try to convince the complaining beneficiaries to keep the expensive compounded medications even if they did not want them since the pharmacy would lose money if the medications were returned.

7

On occasion, Brosius also improperly authorized co-pay waivers to induce beneficiaries to keep compound medications—including refills—that they did not want or need.  Andrews knew of and approved of this illicit practice.  To disguise the co-pay waivers from the health insurers, Brosius instructed Main Avenue Pharmacy employees to obtain money orders and write the patient's name as the payer and Main Avenue Pharmacy as the payee to give the false appearance that the patients had paid the co-pay when they had not.

In total, the defendants submitted claims to health care insurers for compounded medications that exceeded $35,000,000 over the two-plus years of the scheme.  The defendants all shared in the proceeds received from these claims.

## **ARGUMENT**

**I.     Brosius's motion to dismiss Counts 1 and 8 of the Indictment should be denied because neither is duplicitous.**

Brosius seeks dismissal of Count 1 of the Indictment because, he argues, it alleges "two conspiracies in a single count" that "should have been charged in separate counts."  Brosius Br. at 5.  Brosius claims that the Indictment marries in Count 1 both the defendants' agreement to pay kickbacks to marketers and Brosius's agreement with others to waive co-pays.  *Id.*  He argues that these are "distinct and separate offenses" because the "alleged waiving of copays bears no relationship to the remainder of the conspiratorial conduct charged in Count One and should have been charged separately (if at all)."  *Id.* at 7.  Brosius thus contends that there is a "very real risk that Defendant Brosius will be found guilty of the massive conspiracy alleged

in Count One based upon underlying conduct"—waiving co-pays—"that is different in scope and kind, and even though 12 jurors do not agree on the underlying conspiratorial conduct." *Id.* at 8.  As a result, Brosius contends, "the government has charged two separate agreements in a single conspiracy count," and Count 1 should be dismissed. *Id.* at 7, 8.

Brosius also seeks dismissal of Count 8 on a similar basis. *Id.* at 10-11.  He argues that Count 8 includes two separate conspiracies: an agreement to violate the federal Anti-Kickback statute through commission-based marketing agreements, and another agreement between the marketing companies and doctors to pay the doctors kickbacks in exchange for signing prescriptions. *Id.* at 10.  Because there are two separate conspiracies alleged, Brosius contends, the Court must dismiss Count 8 as duplicitous.

Brosius is wrong on both the facts and the law.  As explained below, both Count 1 and Count 8 allege single-object conspiracies, not multiple conspiracies.  And, in any event, courts permit multiple-object conspiracies.  The Court should deny his motion to dismiss Counts 1 and 8.

An indictment is duplicitous where it combines two or more "distinct and separate offenses in a single count." *United States v. Rigas*, 605 F.3d 194, 210 (3d Cir. 2010).  "Duplicitous counts may conceal the specific charges, prevent the jury from deciding guilt or innocence with respect to a particular offense, exploit the risk of prejudicial evidentiary rulings, or endanger fair sentencing." *United States v. Haddy*, 134 F.3d 542, 548 (3d Cir. 1998) (internal citations omitted).

9

However, "[i]t is well established that '[t]he allegation in a single count of a conspiracy to commit several crimes is not duplicitous.'" *United States v. Reyes*, 930 F.2d 310, 312 (3d Cir. 1991) (quoting *Braverman v. United States*, 317 U.S. 49, 54 (1942)). "Although its objectives may be numerous and diverse, a single conspiracy exists if there is one overall agreement among the parties to carry out those objectives." *United States v. Bobb*, 471 F.3d 491, 494–95 (3d Cir. 2006) (citing *Braverman*, 317 U.S. at 53–54).

The Third Circuit uses a three-step inquiry to distinguish a single conspiracy from a series of separate, unrelated conspiracies: "First, we examine whether there was a common goal among the conspirators.  Second, we look at the nature of the scheme to determine whether the agreement contemplated bringing to pass a continuous result that will not continue without the continuous cooperation of the conspirators.  Third, we examine the extent to which the participants overlap in the various dealings." *United States v. Greenidge*, 495 F.3d 85, 93 (3d Cir. 2007) (quoting *United States v. Kelly*, 892 F.2d 255, 259 (3d Cir. 1989)).  The absence of any one factor in this three-step test is not dispositive.  *Greenidge*, 495 F.3d at 93; *United States v. Padilla*, 982 F.2d 110, 115 (3d Cir. 1992).

The essence of conspiracy is agreement, and failing to prove all of the named coconspirators conspired with each other is not a fatal variance.  *Kelly*, 892 F.2d at 258-59.  "[T]he government need not prove that each [conspirator] knew all of the conspiracy's details, goals, or other participants," *United States v. Gibbs*, 190 F.3d 188, 197 (3d Cir. 1999), and the Government likewise need not prove that all members of

10

the conspiracy are mutually interdependent.  *United States v. DiPasquale*, 740 F.2d 1282, 1291 (3d Cir. 1984).

"Multiple conspiracies are separate networks operating independently of each other."  *United States v. Perez*, 280 F.3d 318, 346 (3d Cir. 2002) (internal quotation marks omitted).  "[A] finding of a master conspiracy with sub-schemes does not constitute a finding of multiple, unrelated conspiracies and, therefore, would not create an impermissible variance."  *Id.*, (quoting *United States v. Smith*, 789 F.2d 196, 200 (3d Cir. 1986)).  "[T]he relatedness of the activities of the co-conspirators in support of the over-all illegal scheme can defeat a claim of multiple conspiracies."  *Perez*, 280 F.3d at 346.  Thus, "[a] single conspiracy may exist when there is a continuing core agreement that attracts different members at different times and that involves different sub-groups committing acts in furtherance of an overall criminal objective."  Third Circuit Model Criminal Jury Instruction 6.18.371H.  Ultimately, "[t]he issue of whether a single conspiracy or multiple conspiracies exist is a *fact question to be decided by a jury*."  *Bobb at 494* (emphasis added).

Here, the conspiracies charged in Counts 1 and 8 do not charge multiple offenses but "a single offense, i.e. a conspiracy."  *Reyes*, 930 F.3d at 312.  A "conspiracy is one crime 'however diverse its objectives.'"  *Id.* (quoting *Braverman*, 317 U.S. at 54).  On this basis alone, Brosius's motion alleging duplicity in Counts 1 and 8 should be denied.

11

### A.  Count 1 of the Indictment alleges a single conspiracy.

As an initial matter, Brosius completely misses the mark when he characterizes the conduct charged in Count 1 as separate conspiracies to pay kickbacks to marketers and provide co-pay waivers.  Brosius Br. at 5-8.  On its face, Count 1 alleges that the defendants engaged in a single conspiracy to defraud public and private insurance programs from 2014 through 2016 by submitting insurance claims for expensive compounded medications regardless of medical necessity.  The kickbacks and co-pay waivers provide evidence of the conspiracy to defraud, but they were not themselves the aim of the conspiracy charged in Count 1.  Thus, Brosius's argument fails based solely on his erroneous description of the facts alleged in Count 1.

Brosius is also wrong on the law.  Applying the first *Kelly* factor, described above, the "common goal" of the conspirators here was to make money by receiving reimbursement payments for compounded medications regardless of medical necessity.  *See Greenidge,* 495 F.3d at 93 (common goal was to make money by depositing stolen and altered corporate checks into business accounts); *Kelly*, 892 F.2d at 259 (common goal was simply to make money selling "speed").  They effectuated that common goal by, among other things, concocting bogus prescription pads that were completely disconnected from a patient's medical needs, paying kickbacks to marketers, ignoring or dismissing patient complaints about unwanted medications, and providing co-pay waivers to induce patients to keep unwanted or unnecessary medication. The defendants then shared their illegal profits by splitting lucrative

12

reimbursement payments among themselves and with co-conspirator marketing companies. There is thus no question that the defendants shared a common goal.

Count 1 also makes clear that, consistent with the second *Kelly* factor, this conduct involved the "continuous cooperation of the conspirators." Far from operating independently of one another, for over two years the defendants here closely coordinated with each other, sending almost daily emails among themselves and with others to preserve the scheme and to make it more profitable and efficient. These frequent emails and related discussions among the conspirators pertained to identifying expensive compound formulas; creating updated prescription pads; disseminating those pads to marketing companies; filling prescriptions that came in the door; coordinating billing of health insurers and collecting reimbursements; maximizing refills on compounded medications; waiving co-pays; and convincing disgruntled patients to keep unwanted and unnecessary medication. The "cooperation of the conspirators" here was therefore "continuous" and also demonstrates a single conspiracy.

Finally, turning to the third *Kelly* factor, there was substantial overlap among the participants in the conspiracy. *See United States v. Salmon*, 944 F.2d 1106, 1117 (3d Cir. 1991) ("the continuous participation of one conspirator . . . provided sufficient overlap"). Evidence at trial will show that all four charged conspirators were involved in almost all aspects of the conspiracy. While it is true that Schneiderman was fired around June 2015 and that Beene's (and even Brosius's) role may have grown over time, there was still consistent and regular participation by all members of the

13

conspiracy to fulfill its central aim: billing and receiving reimbursements from insurance for expensive compounded medications regardless of medical necessity. There will therefore be more than sufficient evidence at trial of overlap among the conspirators "to demonstrate a single conspiracy." *Greenidge*, 495 F.3d at 94. Moreover, there is "no requirement that every member must participate in every transaction to find a single conspiracy." *United States v. Beacham*, 774 F.3d 267, 274 (5th Cir. 2014).

As noted above, whether a single or multiple conspiracies existed as part of the alleged scheme is a fact question for the jury. Thus, it is improper for Brosius to seek a ruling on this issue now. Nevertheless, the Indictment clearly alleges a single conspiracy, and Brosius's motion to dismiss Count 1 should be denied.

### B.    Count 8 of the Indictment also alleges a single conspiracy.

The analysis of Count 8 proceeds in a very similar way. Count 8 of the Indictment facially sets forth a single conspiracy for the defendants to pay kickbacks and bribes to the co-conspirator marketing companies in exchange for the marketing companies steering compounded prescriptions back to Main Avenue Pharmacy. Brosius is therefore far off base when he argues that Count 8, on top of the kickbacks from the defendants to the marketing companies, also alleges an "agreement between individual Marketing Companies and physicians to pay/receive kickbacks in exchange for prescriptions." Brosius Br. at 10. Although the payment of kickbacks from the marketing companies to physicians was part of how the overall scheme operated, those kickbacks were not part of the kickback conspiracy alleged in Count 8—namely, the

14

kickbacks paid from the defendants to the marketing companies.  Again, Brosius's erroneous description of the charged conduct is alone sufficient to sink his argument.

Applying the *Kelly* framework also confirms that Count 8 is not duplicitous. First, the "common goal" of the conspirators was to pay kickbacks to the marketers to ensure a steady flow of compounded prescriptions to Main Avenue Pharmacy.  *See Greenidge,* 495 F.3d at 93; *Kelly*, 892 F.2d at 259.  The kickbacks were always tied to the volume of prescriptions steered to Main Avenue Pharmacy by the marketers and the amount of reimbursements that Main Avenue Pharmacy received.  The defendants knew that this practice violated federal law—something they discussed among themselves and with a health-care attorney who explicitly and repeatedly warned them that it was illegal.

Under the second *Kelly* factor—the "continuous cooperation of the conspirators"—the kickbacks were paid continuously over the duration of the conspiracy.  As charged in Count 8, the defendants routinely coordinated with each other about marketers and how much to pay them.  The kickbacks were essential to the success of the conspiracy because they ensured the steady flow of compounded prescriptions, which were the defendants' meal ticket to lucrative reimbursements. The "cooperation of the conspirators" here was therefore "continuous" and demonstrates a single conspiracy.

Finally, turning to the third *Kelly* factor, there was substantial overlap among the participants in the conspiracy.  *See Salmon*, 944 F.2d at 1117.  Evidence at trial will show that all four charged conspirators were involved in the conspiracy to pay

15

kickbacks. There will therefore be more than sufficient evidence at trial of overlap among the conspirators "to demonstrate a single conspiracy." *Greenidge*, 495 F.3d at 94.

Count 8 thus clearly alleges only a single conspiracy. Brosius's motion on this subject should therefore be denied.

## II. The defendants' motions for a Bill of Particulars should be denied because the Indictment and discovery provide ample information about the charged crimes, but the Government will supplement that information by letter to identify certain entities and individuals.

All three defendants seek a Bill of Particulars for unnamed co-conspirators, marketing companies, and other information set forth in the Indictment. *See* Brosius Br. at 12-20, Andrews Mot. at 7 ¶ 33, ECF No. 63 (Beene Br.) at 1-4. They seek a large volume of information on wide-ranging subjects in the Indictment, including:

- The identity of six individuals listed in Counts 2 through 7 and the commercial payors in Counts 3 through 5 (Brosius Br. at 12; Andrews Mot. at 7 ¶ 33);

- The identity of which claims the Government contends were medically unnecessary (Brosius Br. at 14, 17);

- Which prescriptions were procured by kickbacks to doctors and who paid and received them (*id.* at 14, 18);

- The identity of unnamed co-conspirators in Counts 1 and 8 (*id.* at 18);

- The identity of "all unindicted co-conspirators and parties to the offenses alleged in the Indictment" (Beene Br.) at 4;

- The identity of the Marketing Companies involved in the alleged conspiracy (Andrews Mot. at 7 ¶ 33);

- The identity of who the Commercial Payers' fraudulent claims were allegedly submitted to (*id.*);

16

- • The specific amounts of the allegedly fraudulent claims that were submitted (*id.*);

- • Sufficient facts surrounding Andrews's role in each claim submitted that allegedly amounts to health care fraud (*id.*); and

- • Sufficient facts surrounding Andrews's role in offering or paying the alleged kickbacks (*id.*).

Each defendant claims that he cannot mount a proper defense without each of these broad categories of information.

The defendants are seeking far more than the law permits. A bill of particulars is required only when an indictment is too vague to permit the defendant to: (a) understand the charges and prepare a defense, (b) avoid unfair surprise, and (c) assert a claim of double jeopardy where appropriate. *Urban*, 404 F.3d at 771-72. "Only where an indictment fails to perform these functions, and thereby 'significantly impairs the defendant's ability to prepare his defense or is likely to lead to prejudicial surprise at trial[,]' will we find that a bill of particulars should have been issued." *Id.* (internal citations omitted). As long as the indictment enables the defendant to understand the accusations against him and the central facts that the Government will present at trial, a bill of particulars is unwarranted. *See United States v. Rosa*, 891 F.2d 1063, 1066-67 (3d Cir. 1989); *United States v. Zolp*, 659 F. Supp. 692, 706 (D.N.J. 1987); *United States v. Deerfield Specialty Papers, Inc.*, 501 F. Supp. 796, 809-10 (E.D. Pa. 1980).

"A bill of particulars . . . is not intended to provide the defendant with the fruits of the government's investigation, but is instead intended to give the defendant the

*minimum* amount of information necessary to permit the defendant to conduct his own defense." *United States v. Mariani*, 90 F. Supp. 2d 574, 590-91 (M.D. Pa. 2000) (emphasis added) (citing *United States v. Smith*, 776 F.2d 1104 (3d Cir. 1985)); *see also United States v. Eufrasio*, 935 F.2d 555, 575 (3d Cir. 1991); *United States v. Addonizio*, 451 F.2d 49, 64 (3d Cir. 1971). "A bill of particulars is not designed to: obtain the government's evidence; restrict the government's evidence prior to trial; assist the defendant's investigation; obtain the precise way in which the government intends to prove its case; interpret its evidence for the defendant; or disclose its legal theory." *United States v. Bellomo*, 263 F. Supp. 2d 561, 580 (E.D.N.Y. 2003); *see also United States v. Jabali*, Crim. No. 01-801, 2003 WL 22170595, *3 (E.D.N.Y. Sept. 12, 2003) (stating that requests "for exact dates, places, and times in which events occurred . . . ignore the proper scope and function of a bill of particulars and are to be denied").

Here, the Indictment is highly detailed. Count 1 summarizes the fraud conspiracy allegations against the Defendants. It provides background information on Main Avenue Pharmacy and its parent company; describes what compounded medications are; and explains how Medicare and Tricare work. It also sets forth the object of the conspiracy and explains in substantial detail the manner and means of how the conspiracy was carried out—that is, how the defendants defrauded the victim insurance payors repeatedly by using bogus prescription pads and by leveraging kickback relationships with marketing companies to obtain prescriptions for compounded medications without regard to medical necessity.

18

On top of that, Counts 2 through 7 cite six specific instances on six specific dates in which certain defendants caused knowingly fraudulent claims to be made to insurance payors as part of the scheme. Thus, "the specificity with which" the Indictment identifies the particular time period, events, and transactions at issue make it "highly unlikely" that any of the defendants might be "unfairly surprised with . . . unfamiliar" allegations at trial. *United States v. Moyer*, 674 F.3d 192, 203 (3d Cir. 2012).

Furthermore, the Third Circuit has emphasized that a bill of particulars is unnecessary in those cases where, as here, the Government supplements a detailed charging document with substantial discovery. *Urban*, 404 F.3d at 772; *see also United States v. Munoz*, 736 F. Supp. 502, 504 (S.D.N.Y. 1990) (provision of substantial discovery weighs against ordering bill of particulars). Where, as here, "discovery provided by the government fills in the outline of the indictment, the necessity for a bill of particulars declines." *United States v. Caruso*, 948 F. Supp. 382, 393 (D.N.J. 1996); *United States v. Beech-Nut Nutrition Corp.*, 659 F. Supp. 1487, 1499-1500 (E.D.N.Y. 1987) (extensive discovery "must have answered a great many, if not all, of defendants' requests" for discovery and a bill of particulars).

Discovery in this case has been extensive and "provided in an organized and comprehensible fashion." *United States v. Skelos*, Crim. No. 15-317, 2015 WL 6159326, at *13 (S.D.N.Y. Oct. 20, 2015). The defendants received voluminous discovery from the Government on several occasions during the discovery period, and the Government recently supplemented that discovery with detailed claims data from

commercial payors, Medicare, and Tricare.  The defendants therefore have "'that minimum amount of information necessary'" for their "'own investigation'" such that "there is no need to order the bill of particulars requested by Defendant[s]."  *United States v. Grasso*, 173 F. Supp. 2d 353, 367 (E.D. Pa. 2001) (quoting *Smith*, 776 F.2d at 1111).  In addition, the Government plans to furnish defendants with a comprehensive exhibit list before trial, which will lend additional insight into the allegations the Government intends to prove.

A bill of particulars is not only unnecessary, but it may have a detrimental effect on the Government's proofs.  A bill of particulars "effectively narrows the government's case at trial in the same way as the formal charging document: 'there can be no variance between the notice given in a bill of particulars and the evidence at trial.'"  *N. Jersey Media Grp. Inc v. United States*, 836 F.3d 421, 429 (3d Cir. 2016) (quoting *Smith*, 776 F.2d at 1111).  As a result, district courts are understandably reluctant at the pretrial stage to "unduly freeze [the government] to its proofs at trial."  *United States v. Boffa*, 513 F. Supp. 444, 485 (D. Del. 1980).

The Indictment and extensive discovery here thus clearly "contain[] sufficient factual and legal information for the defense to prepare its case."  *United States v. Wabo*, 290 F. Supp. 2d 486, 490 (D.N.J. 2003); *see also United States v. Atwell*, Crim. No. 13-560, 2015 WL 2092687, at *5 (D.N.J. May 5, 2015) (Wolfson, J.) ("[D]iscovery, combined with the sufficiency of the allegations contained in the Superseding Indictment, negates the need for a bill of particulars.").

As a courtesy, even though the information is readily available in discovery, the Government agrees to provide a discovery letter identifying the following information in the Indictment: the six individuals referenced in Counts 2 through 7; the specific marketing companies referred to in the Indictment; the commercial payors referenced in Counts 3 through 5; and the claim amounts in Counts 2 through 7.

Given that disclosure, the defendants' requests for other information in a bill of particulars should be denied as overbroad, irrelevant, and unnecessary.  For example:

- Brosius's demand to know which claims the Government contends were medically unnecessary is not an appropriate subject for a bill of particulars. (Brosius Br. at 14, 17.)  The Government has now turned over all of the claims data from Main Avenue Pharmacy for compounded medications during the relevant time period, and the Government contends that all of those claims were fraudulent.  The very nature of the scheme to defraud—including concocting unique prescription pads directed toward maximizing profit—ensured that *all* compounded prescriptions billed by Main Avenue Pharmacy were procured without regard to medical necessity and thus were the result of fraud.

- Brosius's request to know which prescriptions were procured by kickbacks to doctors (Brosius Br. at 14, 18) is not relevant to any of the charges in the Indictment.  The Government certainly does not need to establish which individual prescriptions were connected to specific kickbacks to prove a conspiracy to defraud or a conspiracy to pay kickbacks.  The requested information is irrelevant and therefore need not be included in a bill of particulars.

- The Government is not obligated to reveal facts at this stage surrounding Andrews's role on claims that amounted to health care fraud or kickback violations.  (Andrews Mot. at 7 ¶ 33.)  The Government has provided ample discovery on Andrews's participation in the conspiracies generally.  And, by law, if Andrews was a member of the conspiracy to do both of those things, then the actions of his co-conspirators are attributable to him.[3]

---

[3] *See United States v. Gonzalez*, 918 F.2d 1129, 1135 (3d Cir. 1990) (citing *Pinkerton v. United States*, 328 U.S. 640, 646-47 (1946)).  Like aiders and abettors, defendants convicted of a

- Beene's claim that a bill of particulars should be granted to provide the names of unindicted co-conspirators (ECF No. 63 (Beene Br.) at 4) is also meritless because Beene is free to identify other conspirators from discovery and conduct his own investigation into them.[4]

In short, the Indictment and voluminous discovery, combined with the Government's forthcoming discovery letter, collectively provide abundant information about the charges and allow the defendants to amply prepare their defense. The defendants' motions for a bill of particulars should therefore be denied.

## III.   Brosius's motion to strike surplusage should be denied.

Brosius moves to strike as surplusage the following information from the Indictment:

- The Government's description of compounded medications, particularly why they are not FDA-approved and the circumstances in which a doctor can lawfully prescribe them (Brosius Br. at 23); and

- The marketers' payment of kickbacks to doctors (*id.*).

Brosius claims that these allegations are "prejudicial because they unfairly suggest to the jury that Defendants engaged in criminal conduct broader than that actually alleged in the Indictment." Brosius Br. at 24.

---

substantive crime on a *Pinkerton* theory are treated as if they had committed that crime themselves. *See United States v. Bailey*, 840 F.3d 99, 112 (3d Cir. 2016) (quoting *Gonzalez*, 918 F.2d at 1135); *United States v. Casiano*, 113 F.3d 420, 427 (3d Cir. 1997) (same).

[4] *See, e.g., United States v. Crayton*, 357 F.3d 560, 568 (6th Cir. 2004) ("The Government is not required to furnish the name of all other co-conspirators in a bill of particulars."); *United States v. Sampson*, No. 11-155, 2012 WL 214707, at *2 (M.D. Pa. Jan. 24, 2012) ("Courts have been highly reluctant to require a bill of particulars when defendants have asked for specific identities of co-conspirators."); *United States v. Knight*, No. 12-0367, 2013 WL 3367259, at *4 (E.D. Pa. July 3, 2013) (denying a bill of particulars seeking the identities of unindicted co-conspirators when significant discovery was provided to allow defendant to conduct his own investigation into the identities of these individuals).

Federal Rule of Criminal Procedure 7(d) permits a court, on motion of the defendant, to strike surplusage from an indictment where such surplusage is both irrelevant to the offenses charged and prejudicial to the defendant. *See United States v. Hedgepeth*, 434 F.3d 609, 611 (3d Cir. 2006). Such motions are rarely granted. *See id.* This is because an indictment is not limited to a bare recitation of the essential elements of the charged offense. Rather, it may contain other language that is "relevant in a general sense to the overall scheme alleged in the indictment," as well as language "relevant to evidence that the government will present at trial." *United States v. Caruso*, 948 F. Supp. 382, 392 (D.N.J. 1996); *see also United States v. Giampa*, 904 F. Supp. 235, 271-72 (D.N.J. 1995). Thus, "the scope of a district court's discretion to strike material from an indictment is narrow." *United States v. Oakar*, 111 F.3d 146, 157 (D.C. Cir. 1997); *see also United States v. Pharis*, 298 F.3d 228, 248 (3d Cir. 2002) (Cowen, J., dissenting) (quoting same).

Here, both items that Brosius identifies as alleged "surplusage" are in fact relevant to the offenses charged. Therefore, the Court need not determine whether they are "prejudicial." *See Hedgepeth*, 434 F.3d at 609 ("[I]nformation that is prejudicial, yet relevant to the indictment, must be included . . . ."); *United States v. Moss*, 9 F.3d 543, 550 (6th Cir. 1993) ("[I]f the language in the indictment is information which the government hopes to prove at trial, it cannot be considered surplusage no matter how prejudicial it may be (provided, of course, it is legally relevant).") (citation and internal punctuation omitted); *United States v. Scarpa*, 913 F.2d 993, 1013 (2d Cir. 1990) ("If evidence of the allegation is admissible and relevant

23

to the charge, then regardless of how prejudicial the language is, it may not be stricken.") (citation and internal punctuation omitted).

First, the descriptions of compounded medications, the reasons they are not approved by the FDA, and the circumstances under which doctors can lawfully prescribe them are all relevant background information to help the jury understand the limited uses of these kinds of medications. Indeed, the jury will not be able to render judgment on the fraud allegations concerning compounds without having a complete understanding of how compounds fit into the health care system. If Brosius wants to dispute the Government's description of compounded medications, he is free to cross-examine the Government's witnesses on that subject and argue to the jury that the information is wrong. But it certainly is not a basis to strike an allegation that provides essential background information and context so the jury can understand the charges against Brosius and the other defendants.

Second, evidence of marketers bribing doctors is vital to the jury's understanding of how the overall fraud scheme worked. It makes no difference whether the defendants knew about these particular bribes—in fact, the Indictment does not allege that they had specific knowledge of them. But a natural question the jury will ask is how Main Avenue Pharmacy obtained so many prescriptions for compounded medications from doctors. And the Government's answer is that the marketing companies that Main Avenue Pharmacy was paying kickbacks to were themselves paying kickbacks to doctors in exchange for signed prescriptions. The evidence will also show that Main Avenue Pharmacy received a significant number of

prescriptions from the very same doctors over and over again for the very same compounded prescriptions. That is evidence the jury can use to infer that the defendants must have known that the prescriptions were not medically necessary. Understanding that those doctors were being paid kickbacks—even if the defendants did not specifically know about the kickbacks—is thus clearly relevant to the jury's understanding of the overall scheme. As *Hedgepeth* makes clear, if the allegations are relevant, they are not surplusage, no matter how prejudicial they are. *See* 434 F.3d at 609. The Court should therefore not strike the allegation as surplusage and should deny Brosius's motion.

## IV.   Defendants' requests for early disclosure of the Government's 404(b) evidence should be denied.

Brosius and Beene ask the Court for an order directing the Government to provide pretrial disclosure of any 404(b) evidence it intends to introduce at trial. Brosius Br. at 25-26; ECF No. 70 (Beene Br.). Brosius asks for 60 days' notice, while Beene asks for 14 days. *Id.*

The Government acknowledges its obligation to make pretrial disclosure of Rule 404(b) evidence. The rule itself requires "reasonable notice in advance of trial." Fed. R. Evid. 404(b). Under the Court's Standing Order, the timing of that notice will be set at a final pretrial conference held no sooner than two weeks after the disposition of pretrial motions.

Indeed, the defendants offer no compelling authority or justification to warrant an order requiring disclosure of Rule 404(b) evidence 60 days before trial. Case law

makes clear that trial courts routinely authorize such disclosure shortly before trial. *See United States v. Blackwell*, 954 F. Supp. 944, 968 (D.N.J. 1997) (denying motion to accelerate the disclosure of Rule 404(b) evidence; disclosure "at least three days before trial . . . [was] adequate"). *See United States v. Morales,* 280 F. Supp. 2d 262, 274-75 (S.D.N.Y. 2003) (denying a motion for immediate disclosure of Rule 404(b) evidence and permitting the Government "to provide notice of all Rule 404(b) material not later than fourteen days before the start of trial"); *see also United States v. Solomonyan,* 451 F. Supp. 2d 626, 646 (S.D.N.Y. 2006) (denying a motion for immediate disclosure of Rule 404(b) evidence; "[t]he motion is premature because the government has not yet decided what evidence [it] will seek to introduce").

Accordingly, a ruling on the timing of disclosure of 404(b) evidence is premature, and the defendants' request should be denied.  If the Government decides to offer evidence pursuant to Rule 404(b), it will provide appropriate notice in a timely manner and as ordered by the Court.

## V.  Beene's motion for the immediate production of *Brady* and *Giglio* material should be denied.

Beene appears to request an order requiring the Government to produce *Brady* and *Giglio* material—and material far broader than that required under either— immediately.  ECF No. 64 at 1-3.

The Government is aware of its obligations under *Brady v. Maryland*, 373 U.S. 8 (1963), which requires the Government to turn over, at the earliest possible time, any "evidence favorable to an accused . . . material either to guilt or to punishment."

*Id.* at 87.  Should any exculpatory material come into the Government's possession, the Government will disclose it promptly.  Accordingly, no court order is necessary, and the Court should deny the motion.

The Government is also aware of its obligation to disclose any *Giglio* information that goes to the credibility of prosecution witnesses. *See Buehl v. Vaughn*, 166 F.3d 163, 181 (3d Cir. 1999).  Consistent with these obligations and an anticipated final scheduling order setting forth a date for *Giglio* disclosures, the Government will disclose any *Giglio* material related to Government witnesses at the appropriate time.  Accordingly, to the extent that Beene is requesting immediate disclosure of *Giglio* material—including any Government agreements with witnesses that call for immunity, leniency, special considerations, and threats of prosecution, among other things, *see* ECF No. 65—those requests are premature and should be denied.

Finally, to the extent any of Beene's requests go beyond what is required by law—like his request for all names and addresses of individuals interviewed by the Government regardless of the contents of those interviews or whether they will testify at trial (*see* ECF No. 65 at 2)—the Government does not intend to produce such information.  Any such request should be denied.

## VI. Beene's motion for early disclosure of Jencks material should be denied.

Despite recognizing that the Court cannot order or compel the Government to make early Jencks Act disclosures, *see* ECF No. 68 at 1, Beene still seeks early

production of Jencks material 14 days before trial.  *See id.*  This request should be denied.

The Jencks Act, which was adopted to set limits on pretrial discovery of statements in criminal cases, provides that: "In any criminal prosecution brought by the United States, no statement or report in the possession of the United States which was made by a United States witness . . . shall be the subject of subpoena, discovery, or inspection until said witness has testified on direct examination in the trial of the case."  18 U.S.C. § 3500(a).  Thus, disclosure of a government witness's prior statements or reports is not required until after the witness has testified.

The Jencks Act reflects a legislative determination that a criminal defendant is entitled to use prior statements for impeachment purposes in cross-examination.  *See Palermo v. United States*, 360 U.S. 343, 349 (1959).  But the Jencks Act is not a discovery vehicle, which is why the Third Circuit has repeatedly held that a district court cannot compel the government to disclose statements of its witnesses before the conclusion of the witness's direct examination. *See United States v. Higgs*, 713 F.2d 39, 44-45 (3d Cir. 1983); *United States v. Scolnick*, 392 F.2d 320, 327 (3d Cir. 1968).

The Government, however, recognizes that "early disclosure to obviate trial interruptions is encouraged."  *United States v. Bissell*, 954 F. Supp. 841, 871 (D.N.J. Dec. 13, 1996) (citing *United States v. Hill*, 976 F.2d 132, 140 (3d Cir. 1992)).  Accordingly, the Government will voluntarily produce Jencks material at least a week before trial.  This early disclosure will afford defense counsel an adequate opportunity to prepare for cross-examination without delaying the trial.

The defendants have a reciprocal duty to produce to the Government prior statements of their witnesses.  Fed. R. Crim. P. 26.2.  Considering the Government's willingness to produce Jencks material a week before trial, the Government requests that defense counsel reciprocate by providing defense Jencks material at least one week in advance of the testimony of defense witnesses.  If any defendants decline to use the same timetable for their required disclosures, the Government expects that defendant to notify the Government and the Court at least one week prior to the beginning of trial.

**VII.  Beene's request for a *Kastigar* hearing is misplaced and should be denied.**

Beene asks the Court to order a *Kastigar* hearing.  ECF No. 67.  The Court should deny the motion, however, because *Kastigar* hearings apply only to statutory grants of immunity.  Moreover, Beene's proffer agreement here explicitly allows the derivative use of his statements.

To establish the necessity of holding a *Kastigar* hearing, the defendant must demonstrate that he testified under a *statutory* grant of immunity and that his testimony concerned the conduct for which he was indicted.  *United States v. Plummer*, 941 F.2d 799, 802 (9th Cir. 1991); *United States v. Hughes*, 2018 WL 2734854, *2 (M.D. Pa. June 7, 2018).  But Beene did not testify here under a statutory grant of immunity. To the contrary, he was interviewed in an informal proffer governed by an agreement between him and the Government. Because Beene testified "pursuant to an informal immunity agreement and was not compelled to testify under statutory immunity," a

*Kastigar* hearing is not warranted.  *Hughes*, 2018 WL 2734854, *2.  The Court should deny his request on that basis alone.

But that is not the only reason to deny Beene's request. Beene and the Government also entered into an immunity agreement, or "proffer agreement," that expressly permits derivative use of his statements. In such a case, immunity issues are addressed based on ordinary contract principles.  *United States v. Merz*, 396 Fed. Appx. 838, 841 (3d Cir. 2010).  The April 2, 2020 proffer agreement between Beene, Beene's counsel, and the Government here provides as follows:

> The government *may make derivative use* of and may pursue any investigative leads suggested by any statements made or other information provided by your client, and *may use the evidence or information obtained therefrom against your client in any manner*.

(emphases added). So, by its terms, the proffer agreement that Beene signed permitted the Government to make derivative use of his proffer statements. This provision "eliminates the necessity of a *Kastigar* hearing" where the Government would have to prove that its evidence is untainted by the proffered statements.  *Merz*, 396 Fed. Appx. at 841. *See United States v. Pielago*, 135 F.3d 703, 710–711 (11th Cir. 1998) (holding derivative use of proffer statement to identify co-conspirator that testified against the defendant did not prejudice defendant); *United States v. Chiu*, 109 F.3d 624, 625–26 (9th Cir. 1997) (allowing proffer statements to be used to prepare witnesses for trial). This is yet another reason that Beene is not entitled to a *Kastigar* hearing.  The Court should therefore deny Beene's request for one.

30

Finally, as a factual matter, the Government did not rely on any of Beene's proffer statements—derivatively or otherwise—to support the allegations in the Indictment. Beene's assertions to the contrary are speculative and baseless. But, for the reasons discussed above, the Court need not reach that issue to deny Beene's motion.

## VIII. Beene's motion for a hearing on the admissibility of co-conspirator and unindicted co-conspirator statements should be denied.

Beene requests a pretrial hearing to determine the admissibility of co-conspirator statements under Federal Rule of Evidence 801(d)(2)(E) (known as a "*James* hearing" after *United States v. James*, 590 F.2d 575 (5th Cir. 1979) (en banc)). ECF No. 66. His request should be denied.

Pursuant to Rule 801(d)(2)(E), an out-of-court statement is admissible as non-hearsay where the Government demonstrates by a preponderance of the evidence that: (1) a conspiracy existed when the statement was made; (2) both the declarant and the defendant against whom the statement is offered were members of that conspiracy; and (3) the statement was made during the course, and in furtherance of, the conspiracy. *Bourjaily v. United States*, 483 U.S. 171, 175-76 (1987); *United States v. Bobb*, 471 F.3d 491, 498-99 (3d Cir. 2006). In making a factual determination on the admissibility of co-conspirator statements, the Court may consider the statements themselves as well as any other independent evidence of the conspiracy. *Bourjaily*, 483 U.S. at 180-81; *United States v. McGlory*, 968 F.2d 309, 333-34 (3d Cir. 1992).

31

The Third Circuit has never required district courts to conduct a *James* hearing to determine whether a statement is admissible under Rule 801(d)(2)(E). Rather, the Third Circuit has explained that co-conspirator statements may be introduced at trial "without a prior showing of a conspiracy based on independent evidence, subject to the requirement that the government make such a showing by the close of its case." *United States v. Ammar*, 714 F.2d 238, 246 (3d Cir. 1983); *see United States v. Gambino*, 926 F.2d 1355, 1360-61 (3d Cir. 1991) (affirming admission of statements subject to later connection to conspiracy); *United States v. DePeri*, 778 F.2d 963, 981 (3d Cir. 1986) (same). The Third Circuit has explained that such a procedure accords with the district court's "control of the order of proof at trial," *United States v. Continental Group, Inc.*, 603 F.2d 444, 456 (3d Cir. 1979), and avoids "unduly complex and confusing" alternatives in cases involving "interrelated testimony" of a continuing conspiracy, *id.* at 457, and the need to hold lengthy and time-consuming mini-trials, *see Ammar*, 714 F.2d at 247; *see also Bourjaily*, 483 U.S. at 176 n.1 (refusing to opine as to whether ruling needed to be made before trial); *Gambino*, 926 F.2d at 1360-61.

Here, this Court should not hold a *James* hearing, which would amount to precisely the sort of time-consuming mini-trial the Third Circuit has sought to avoid. The Government would be forced to present much of its case-in-chief to show that Beene conspired with potential declarants and then duplicate it for the jury. It would also represent an undue windfall for Beene, who would get a dress rehearsal of the Government's case.

32

Moreover, this is not a case with multiple defendants involved in separate conspiracies. If the Government seeks to introduce a co-conspirator statement, it will have been made in furtherance of a conspiracy in which Beene allegedly took part.

Therefore, this Court should deny the request for a pretrial hearing and admit statements pursuant to Rule 801(d)(2)(E) at trial, if need be, subject to connection.

## IX. Beene's motion for a cautionary instruction regarding cooperating witnesses related to Main Avenue Pharmacy should be denied.

Beene asks the Court for a jury instruction concerning cooperating witnesses' testimony about "the conduct of the business entities" involved in the case.  ECF No. 69.  It is unclear exactly what testimony Beene is talking about.  But testimony about the conduct of Main Avenue Pharmacy and Scrips is directly relevant to a host of issues in the case.  In any event, the motion is premature.  It pertains to an evidentiary question that should be raised closer to trial when the Government's proofs are more clearly delineated, and the Court can make an informed ruling on a more complete record.

## <u>CONCLUSION</u>

For the foregoing reasons, the Government respectfully submits that each of defendants' pretrial motions should be denied.

Respectfully submitted,

PHILIP R. SELLINGER
United States Attorney

By:     /s/ Jason S. Gould
Jason S. Gould
Joshua L. Haber
Assistant United States Attorneys

Dated:  April 15, 2022
        Newark, New Jersey

34